IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PACIFIC DAWN, LLC, et al.,

    Plaintiffs,

v.

JOHN BRYSON, et al.,

    Defendants.

NO. C10-4829 TEH

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

   This matter came before the Court on December 12, 2011, on the parties' cross-motions for summary judgment. After carefully considering the parties' written and oral arguments, the Court now GRANTS IN PART and DENIES IN PART the motions for the reasons discussed below.

## I. BACKGROUND

   This case concerns the manner in which Defendants John Bryson, sued in his official capacity as Secretary of Commerce ("Secretary");[1] National Marine Fisheries Service ("NMFS"); and National Oceanic and Atmospheric Administration ("NOAA") regulate the fishing of Pacific whiting off the coasts of Washington, Oregon, and California. The Secretary oversees NOAA, which includes NMFS among its member agencies. Plaintiffs Pacific Dawn LLC, Chellissa LLC, James and Sandra Schones, Da Yang Seafood Inc., and Jessie's Ilwaco Fish Company own three fishing vessels and two processing companies that participate in the Pacific whiting industry.

---

[1] Bryson is substituted for Defendant Gary Locke pursuant to Federal Rule of Civil Procedure 25(d).

Plaintiffs contend that Defendants violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA" or "Act"), 16 U.S.C. §§ 1801-84, when they adopted Amendments 20 and 21 to the fishery management plan for Pacific groundfish, which includes Pacific whiting. Amendment 20 created a limited access privilege program through which participants in the trawl sector of the fishery receive permits to harvest a specific portion of the fishery's total allowable catch via individual fishing quotas ("IFQs"). Amendment 21 allocated total allowable catch for certain species in the fishery between the trawl and non-trawl sectors.

Congress enacted the MSA, among other purposes, "to conserve and manage the fishery resources found off the coasts of the United States," "to promote domestic commercial and recreational fishing under sound conservation and management principles," and "to provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b)(1), (3)-(4). The Act created eight regional fishery management councils, including the Pacific Fishery Management Council ("Council") that governs the fishery at issue in this case. 16 U.S.C. § 1852. These councils must develop, and submit to the Secretary for approval, fishery management plans ("FMPs") and "amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed)." 16 U.S.C. § 1852(b), (h)(1). FMPs must comply with ten national standards, 16 U.S.C. § 1851(a), and the MSA also enumerates certain factors that councils must take into account when developing programs that limit access to a fishery. *E.g.*, 16 U.S.C. §§ 1853(b)(6), 1853a.

Of relevance to Plaintiffs' instant claims,[2] NMFS issued regulations implementing Amendment 6 to the FMP for Pacific Groundfish in 1992, to take effect on January 1, 1994.

---

[2] The parties are familiar with the facts of this case, and the Court here offers only a brief summary of relevant portions of the extensive administrative record.

2

Those regulations required federal permits to participate in the limited entry segment of the fishery and established different levels of endorsements, including "A" and "B." 57 Fed. Reg. 32,499, 32,501-03 (July 22, 1992). "A" endorsements were transferable endorsements that were granted to vessels that met specific minimum landing requirements during the qualifying window period of July 11, 1984, through August 1, 1988. *Id.* at 32,501. "B" endorsements were non-transferable and granted to vessels that "landed some groundfish prior to August 1, 1988," but that did not meet the requirements to receive an "A" endorsement. *Id.* "'B' endorsements expire[d] at the end of the 1996 fishing year, by which time vessel owners must have obtained a permit with an 'A' endorsement or have left the limited entry fishery." *Id.* at 32,503.

In 2004, NMFS published an advanced notice of proposed rulemaking announcing that the Council was:

> considering implementing an individual quota (IQ) program for the Pacific Coast groundfish limited entry trawl fishery off Washington, Oregon and California. The trawl IQ program would change management of harvest in the trawl fishery from a trip limit system with cumulative trip limits for every 2-month period to a quota system where each quota share could be harvested at any time during an open season. The trawl IQ program would increase fishermen's flexibility in making decisions on when and how much quota to fish. This document announces a control date of November 6, 2003, for the trawl IQ program. The control date for the trawl IQ program is intended to discourage increased fishing effort in the limited entry trawl fishery based on economic speculation while the Pacific Council develops and considers a trawl IQ program.

69 Fed. Reg. 1563 (Jan. 9, 2004).

The Council subsequently decided to allocate IFQs for Pacific whiting to current permit holders based on fishing history associated with such permits from 1994 to 2003 for harvesters, and from 1994 to 2004 for on-shore processors. Fishing history under "B"-endorsed permits was included when determining the total catch for the fishery in each year of the qualifying periods, but it was not included "in calculating any permit's individual qualifying history." Nov. 21, 2011 Joint Supplemental Br. at 3 (ECF Docket No. 47) (parties' jointly agreed description of how "B"-permit history was used in calculating IFQs);

3

*see also* 75 Fed. Reg.60,869, 60,956 (Oct. 1, 2010) (setting forth allocation rules). The final rules implementing Amendments 20 and 21 were issued in October and December 2010, and implementation of the IFQ system began on January 1, 2011. 75 Fed. Reg. 60,869; 75 Fed. Reg. 78,344 (Dec. 15, 2010).

The MSA requires that:

> In developing a limited access privilege program to harvest fish a Council or the Secretary shall –
>
> (A) establish procedures to ensure fair and equitable initial allocations, *including consideration of* –
>
> > (i) *current and historical harvests*;
> >
> > (ii) employment in the harvesting and processing sectors;
> >
> > (iii) investments in, and dependence upon, the fishery; and
> >
> > (iv) the current and historical participation of fishing communities.

16 U.S.C. § 1853a(c)(5) (emphasis added). Plaintiffs contend that Defendants violated subsection (i) of this provision – and also failed to base their decisions on "the best scientific information available," as required by National Standard Two, 16 U.S.C. § 1851(2) – in two ways: first, by not considering fishing history for harvesters beyond 2003 and for processors beyond 2004 and, second, by not adequately considering fishing history associated with "B" permits.[3] Plaintiffs argue that their initial IFQs would have been higher had harvests beyond 2003 and 2004 been considered.[4] Plaintiff Pacific Dawn further asserts that it obtained ownership of the fishing history of the Amber Dawn, a vessel that fished under a "B"-endorsed permit from 1994 to 1996, and that this history was not but should have been included when Defendants determined Pacific Dawn's initial IFQ. The parties agree that

---

[3] In their papers, Plaintiffs discuss separately the 2003 and 2004 cutoff dates for harvesters and processors, respectively. The Court considers these issues concurrently because they are based on the same legal arguments.

[4] Plaintiff Da Yang Seafood Inc. did not receive an initial IFQ because it had no history prior to the 2004 cut-off date for processors. It contends that it should have received one based on its more recent history.

4

summary judgment is an appropriate mechanism for resolving Plaintiffs' claims, and their cross-motions for summary judgment are now pending before the Court.

## II. LEGAL STANDARD

A court shall set aside regulations adopted under the MSA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1855(f)(1)(B) (adopting the standards for judicial review under 5 U.S.C. § 706(2)). This is a "highly deferential" standard of review, and an agency's action is presumed to be valid and should be affirmed "if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks and citation omitted). A reviewing court's "only task is to determine whether the Secretary has considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002). The court "cannot substitute [its] judgment of what might be a better regulatory scheme . . . if the Secretary's reasons for adopting it were not arbitrary and capricious." *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996).

"[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). Review is generally "limited to the administrative record on which the agency based the challenged decision." *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). The Ninth Circuit allows expansion of the record only "in four narrowly construed circumstances: (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." *Id.* In this case, neither party has asked the Court to supplement the administrative record.

5

## III. DISCUSSION

As an initial matter, Defendants correctly argue that the Act's use of the word "consideration" does not mandate a particular outcome. *See e.g., Pac. Coast Fed'n of Fishermen's Ass'ns v. Locke*, Case No. C10-4790 CRB, 2011 WL 3443533 (N.D. Cal. Aug. 5, 2011), at *5-7. However, unlike the plaintiffs in *Pacific Coast Federation*, Plaintiffs here challenge not simply the end result, but also whether Defendants considered the required statutory factors in reaching that result. The MSA unambiguously requires that Defendants consider certain factors, including "current and historical harvests." 16 U.S.C. § 1853a(c)(5)(A)(i). As explained above, Defendants must have "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Midwater Trawlers Coop.*, 282 F.3d at 716.

### A. Consideration of fishing history beyond 2003 and 2004

Plaintiffs first argue that Defendants improperly failed to consider "current" harvests when, in 2010, they based initial IFQs on fishing histories through 2003 for harvesters and 2004 for processors. Defendants assert that they adequately considered current harvests by allocating quota shares to current permit owners rather than to individuals or vessels that may have participated in the fishery in the past. However, the statute requires consideration of current harvests, not current permits, and considering historical harvests of current permits is distinguishable from considering current harvests themselves. Defendants have cited no authority to the contrary.

Defendants' main argument on this issue is that they reasonably based the end of the qualifying period on the previously published 2003 control date. Plaintiffs raise several challenges to the validity of that control date, none of which have merit. First, Plaintiffs assert that the 2003 date reflected only a political statement or compromise, but they cite no evidence for this assertion.[5] Thus, this case is distinguishable from *Hadaja, Inc. v. Evans*, in which the regional council "urged the industry groups to reach a compromise," and the

---

[5] As noted below, there is evidence in the record, however, that the extension of the qualifying period for processors to 2004 was the result of compromise.

6

"limited access scheme was adopted directly from the compromise reached." 263 F. Supp. 2d 346, 350, 354 (D.R.I. 2003). Plaintiffs also argue that a proposed control date is only valid if it is adopted as a formal regulation. However, Plaintiffs cite no authority to support that conclusion, and the Third Circuit recently rejected that argument, concluding that the government need not go through formal rule promulgation procedures before setting a control date; instead, the court held that publication of a proposed control date in the Federal Register was sufficient. *Gen. Category Scallop Fishermen v. Sec'y of Commerce*, 635 F.3d 106, 113 (3d Cir. 2011). Finally, Plaintiffs argue that an interim amendment to the FMP – Amendment 15 – superseded the control date, but they cite no authority to rebut Defendants' conclusion in the record, in response to a comment to the proposed regulation, that:

> Nowhere does Amendment 15 address the 2003 control date or purport to change the qualifying period for the Groundfish trawl program. Amendment 15 was a limited interim action for the non-Tribal whiting fishery issued in anticipation of the trawl rationalization that in no way attempted to address matters beyond its limited scope. Moreover, the Council has explicitly stated that vessels that qualified for whiting fishery participation under Amendment 15 were not guaranteed future participation or inclusion in the Pacific whiting fishery under the provisions of Amendment 20.

B22:638 (June 2010 Final Environmental Impact Statement prepared by the Council and NMFS) (citation omitted).[6] In light of all of the above, the Court finds that the proposed control date was procedurally valid and was not subsequently invalidated by Amendment 15.

Defendants explain that they chose to base the qualifying period on the announced control date because using a later date would "reward those who disregarded the control date announcement, create perceptions of inequity, and encourage fishermen to ignore such dates in the future, negatively affecting the Council's ability to credibly use control dates." B22:A-151; *see also* B22:A-146 ("The allocation period that would most likely minimize dislocation and the attendant costs would be the few years just prior to the initial allocation.

---

[6] The Court adopts the parties' system of citation to the administrative record. Thus, the quoted language appears at page 638 of document B22. Pagination denoted with an asterisk refers to page numbers in the document's PDF format rather than pagination identified on the document itself.

7

That period is not used, in part, because of issues related to the need to establish credible control dates to effectively manage the fishery while deliberations on new LE [limited entry] programs are underway."). A similar rationale was upheld by the Ninth Circuit in *Alliance Against IFQs v. Brown*. In that case, the relevant statute required that "present participation in the fishery" be "take[n] into account."[5] 84 F.3d at 346 (quoting 16 U.S.C. § 1853(b)(6)(A)). The government allocated quota shares in 1993 to owners or lessees of vessels that made legal landings of halibut or sablefish during the years 1988 to 1990. *Id.* at 345-46. The Ninth Circuit found that the most persuasive reason for a 1990 cutoff date "was that if participation in the fishery while the rule was under consideration had been considered, then people would have fished and invested in boats in order to obtain quota shares, even though that would have exacerbated overcapacity and made no economic sense independently of the regulatory benefit." *Id.* at 346. The court ultimately concluded that the three-year period between the end of the cutoff period and promulgation of the regulations was not arbitrary or capricious:

> Congress left the Secretary some room for the exercise of discretion, by not defining "present participation," and by listing it as only one of many factors which the Council and the Secretary must "take into account." While the "participation" that the Council actually considered was admittedly in the "past" judged from the time when the final regulations were promulgated, it was roughly "present" with the time when the regulations were first proposed: The Council began its process on this plan in 1990, and considered participation in 1988, 1989, and 1990. The process required to issue a regulation necessarily caused substantial delay. The process of review, publication, public comments, review of public comments, and so forth, had to take a substantial amount of time, *see* 16 U.S.C. § 1854(a), and the environmental impact review also was lengthy, as it typically is, *see* 42 U.S.C. § 4332(2)(C). "Present" cannot therefore prudently be contemporaneous with the promulgation of the final regulations.

---

[5] Plaintiffs assert that Congress intended the word "current" to refer to more recent events than "present," but they cite no authority for that position. Moreover, their moving papers rely on a dictionary definition of "current" expressed in terms of "present." Pls.' Mot. at 9 (defining "current" as "presently elapsing, occurring in or existing at the present time; most recent") (quoting Merriam-Webster Unabridged Dictionary (2010)).

8

> We further believe that the Secretary had a good reason for disregarding participation in the fishery during this lengthy process, because the alternative would encourage the speculative over-investment and overfishing which the regulatory scheme was meant to restrain. Under the regulations, eligibility for quota shares depends on fishing during the years 1988, 1989, and 1990. Whatever years are used necessarily recede into the distant past. Even in 2005, assuming the regulatory scheme lasts that long, the quota shares will be based on fishing prior to 1991. Future generations of fishermen will continue to be governed by these pre-1991 allocations. Had the Secretary extended the 1990 cutoff, the incentive to pour money and time into the fishery in order to get a bigger quota share, for those who could afford a long term speculation, would have been enormous.
>
> Thus, while the length of time between the end of the participation period considered and the promulgation of the rule *pushed the limits of reasonableness*, we are unable to characterize use of a 1988 through 1990 period as so far from "present participation" when the regulation was promulgated in 1993 as to be "arbitrary or capricious."

*Id.* at 347-48 (emphasis added) (citations omitted).

*Alliance Against IFQs* would clearly support upholding the regulations at issue in this case had they been promulgated in 2006 rather than 2010. The same "good reason" that supported the cutoff date in that case applies equally here: the desire to curb speculation while the regulations were under review. *Id.* at 347. Plaintiffs counter that there is no evidence of rampant speculation in the whiting industry that would undermine conservation and management efforts, and a control date was therefore unnecessary, but it could very well be that the announcement of a control date is what curbed any such speculation.

However, if three years between the end of a qualifying period and promulgation of a regulation "pushe[s] the limits of reasonableness," *Alliance Against IFQs*, 84 F.3d at 348, then the six- and seven-year periods in this case arguably fall beyond those limits. While "current" cannot "prudently be contemporaneous with the promulgation of the final regulations," it may be that a 2003 cutoff date is "so far" from "current" harvests when the regulation was promulgated in 2010 as to be arbitrary or capricious. *Id.* at 347-48. At oral argument, Defendants asserted that this case was more factually complex than *Alliance Against IFQs* – for example, because more species were at issue and Congress passed amendments to the MSA while the regulations were under consideration – and that a longer

9

1 period of time to develop the regulations was therefore reasonable. The parties did not brief
2 this issue, and it may be that the increased factual complexity would, indeed, render the
3 delays in this case reasonable.

4 The Court need not and does not decide this question because an independent basis
5 exists for rejecting the regulations in this case: Even if it was conceptually reasonable for
6 Defendants to have relied on a 2003 control date when promulgating regulations in 2010, the
7 manner in which they did so here was not rational. As Defendants correctly observe, the
8 record demonstrates that harvests up to 2006 were considered for some purposes. At first
9 glance, this would appear to support Defendants because it indicates that they considered
10 harvests more recent than 2003. However, it actually undermines Defendants' position
11 because Defendants fail to explain why it was rational to rely on the control date for some
12 purposes but not others. For example, Defendants considered harvests from 2003 to 2006
13 when examining species considered to be overfished. *E.g.*, D45:*64-68 (Aug. 3, 2010
14 Decision Memorandum from NOAA Regional Administrator William W. Stelle, Jr. to
15 NOAA Assistant Administrator for Fisheries Eric C. Schwaab). They justified going beyond
16 the 2003 control date as follows:

> The ratios could not be calculated without using information from
> the West Coast Groundfish Observer Program. This program
> was not fully operational until 2003, so use of earlier years
> would not have been practicable. In addition, the Rockfish
> Conservation Areas (RCAs) were first created in 2003. Fishing
> operations were greatly affected by the creation of the RCAs,
> which will remain in place for the foreseeable future. The
> Council considered it important to recognize the changes caused
> by the RCAs, that choosing earlier years would not have done so,
> and that an estimate of likely patterns of activity should be based
> on a period of time when the RCAs were in place. The Council
> also considered using later years, but rejected this approach
> because the years 2003-2006 reasonably reflected recent fishing
> patterns, while not diverging too far from the target species
> allocation period of 1994-2003.

25 D45:*66. While the development of the RCAs provides a rational basis for departing from
26 the 2003 control date in allocating QS for overfished species, it is questionable that
27 Defendants considered whether the chosen qualifying period "reasonably reflected recent
28 fishing patterns" for these species when they do not appear to have undertaken the same

10

1 analysis for Pacific whiting.  For instance, the distribution of whiting among Washington,
2 Oregon, and California appears to have shifted significantly after 2003, with Washington's
3 share moving from 29% in 2003 to 50% in 2008, but Defendants have not cited to any
4 portion of the record where they considered whether the IFQ allocations based on history
5 through 2003 and 2004 "reasonably reflected" these more recent fishing patterns.  *See*
6 M379:6, 8 (July 9, 2010 comments on proposed rule prepared for Plaintiff Pacific Dawn by
7 Steve Hughes).

8 Defendants also looked at more recent harvests when considering whether new
9 entrants would be prejudiced.  B22:A-216.  They concluded that:

> With respect to whiting, five new buyers have entered the fishery since 2004 (the end of the whiting QS [quota share] allocation period for processors), but these buyers have purchased nearly 3 percent of the shoreside whiting landings and about 9 percent of the landings in California (which are much smaller than for Oregon and Washington, Table A-76).  With the possible exception of California, it does not appear that there are many post-2004 entrants with significant amounts of landings that will not receive an initial allocation of whiting QS under the IFQ program.

*Id.*  Defendants make no argument as to why it was rational for them to exclude these new entrants, particularly the ones that had "significant amounts of landings that will not receive an initial allocation of whiting QS under the IFQ program."  There does not appear to be any evidence, for example, that the new entrants engaged in speculation when they entered the market after the announced 2003 control date.

Most problematic is Defendants' explanation of why the qualifying period for processors was extended to 2004.  Defendants did not rely on the 2003 control date for processors "because keeping the date at 2003 was viewed to disadvantage a processor that was present as a participant during the window period but had increased its share of the processing substantially since the close of the original allocation period (2003)."  B22:A-214.  Thus, the extension to 2004 was made to benefit a single processor, which begs the question of why that particular processor should benefit – notwithstanding an earlier control date – when others should not.  This appears to be a quintessential case of arbitrariness.  Moreover,

11

the record unequivocally states that the extension of the period to 2004 for harvesters was the result of "a compromise arrived at during industry negotiations," B22:A-146, thus undermining any argument that Defendants' decision-making was free from political compromise.

While Defendants correctly argue that they have broad discretion to make decisions, and that no particular outcome is required by the MSA, they have failed to present a reasonable explanation for relying on the 2003 control date for some purposes but not others. Consequently, the Court finds that Defendants' failure to consider fishing history beyond 2003 for harvesters and 2004 for processors was arbitrary and capricious. Plaintiffs' motion for summary judgment is GRANTED on this issue, and Defendants' motion is DENIED.

### B. Consideration of "B"-permit history

Plaintiffs next argue that Defendants violated the MSA by failing to give adequate consideration to fishing history conducted under "B" permits. The parties agree that "B"-permit history was not credited to any current permit holder when determining qualifying history for purposes of allocating initial IFQs. Defendants explain that such history was excluded because they followed a policy of having fishing history follow the permit – i.e., they allocated shares to owners of current permits to "ensure[] that the allocation will go to those that currently own assets in the fishery," B22:A-119, and based such allocations on the catch history associated with each given permit, not the catch history of any particular vessel.

Given the decision to base IFQs on fishing history associated with current permits – a decision that Plaintiffs do not challenge – it was not arbitrary or capricious for Defendants to exclude "B"-permit history when calculating qualifying fishing history. While Plaintiff Pacific Dawn may well have entered into an agreement to purchase the fishing history of the Amber Dawn, the "B" permit under which the Amber Dawn fished expired in 1996. Contrary to Plaintiffs' assertions, the record is clear that "B" permits were not transferable and were no longer valid after 1996. *E.g.*, 57 Fed. Reg. 32,499, 32,501 ("A 'B' endorsement allows the vessel to participate in the limited entry fishery through 1996, when all 'B'

12

endorsements will expire."); *id.* at 32,503 ("The non-transferable 'B' endorsement provides short-term access to the fishery. . . . 'B' endorsements expire at the end of the 1996 fishing year, by which time vessel owners must have obtained a permit with an 'A' endorsement or have left the limited entry fishery."). Plaintiffs have failed to establish that the history of the Amber Dawn when it fished under a "B" permit is associated with any current permit, and it was therefore reasonable for Defendants not to have credited such history when it allocated initial IFQs. Accordingly, Defendants' motion for summary judgment is GRANTED on this issue, and Plaintiffs' motion is DENIED.

### C. Remedy

Having found for Plaintiffs on one issue, the Court must now determine an appropriate remedy. Plaintiffs ask that the regulations be set aside and the matter be remanded to NOAA, but Defendants request an opportunity to file additional briefs on an appropriate remedy. In their reply, Plaintiffs failed to offer any reason why such briefing would be unnecessary and instead merely repeated their conclusory request that the regulations be set aside and that NOAA be ordered to revise the regulations in compliance with the MSA. Although the parties could – and should – have included more discussion on an appropriate remedy in their papers, they did not. The Court therefore finds it prudent to consider supplemental briefing before granting any relief.

### IV. CONCLUSION

As discussed above, Plaintiffs' and Defendants' motions for summary judgment are both GRANTED IN PART and DENIED IN PART. Plaintiffs prevail on the issue of whether Defendants violated the MSA by basing initial IFQ allocations on fishing history only through 2003 for harvesters and 2004 for processors. Defendants prevail on the issue of whether they adequately considered fishing history conducted under "B" permits.

The parties shall submit supplemental briefing on an appropriate remedy. They shall file simultaneous briefs on or before **January 30, 2012,** and simultaneous reply briefs on or before **February 13, 2012.** The matter will then be deemed submitted on the papers unless

the Court subsequently orders oral argument. Alternatively, if the parties wish to appeal this order before litigating an appropriate remedy, the Court will consider a motion to make the requisite findings for an interlocutory appeal under 28 U.S.C. § 1292.

**IT IS SO ORDERED.**

Dated: 12/22/11

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT