IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PACIFIC DAWN, LLC, et al.,

                Plaintiffs,

v.

JOHN BRYSON, et al.,

                Defendants.

NO. C10-4829 TEH

ORDER ON REMEDY

On December 22, 2011, this Court granted in part and denied in part Plaintiffs' motion for summary judgment. The Court found that Defendants' failure to consider history beyond 2003 for harvesters and 2004 for processors when setting initial fishing quotas ("IFQs") for Pacific whiting was arbitrary and capricious. The Court ordered supplemental briefing on remedy because the parties' summary judgment papers failed to address that issue adequately. Having carefully considered the parties' supplemental briefs, the Court finds it appropriate, for the reasons discussed below, to remand the regulations for reconsideration prior to the start of the fishing season that begins on April 1, 2013.

**DISCUSSION**

The parties agree that the regulations at issue should be remanded to Defendants for further consideration consistent with the Court's summary judgment ruling. However, they disagree on a deadline for adopting new regulations and whether the current regulations should be vacated pending remand.

Plaintiffs assert that Defendants can and should adopt new regulations prior to the start of the 2012 fishing season for Pacific whiting, which they contend begins on May 15, 2012. Their initial supplemental brief also suggested that the existing regulations remain in place unless Defendants fail to implement new regulations prior to December 1, 2012.

1  Plaintiffs altered their position in their supplemental reply, in which they request either that
2  the existing regulations be vacated if Defendants fail to implement revised regulations prior
3  to May 15, 2012, or that they be vacated indefinitely pending the implementation of revised
4  regulations.
5      Defendants, by contrast, contend that it would be impossible for them to implement
6  new regulations by the start of the 2012 Pacific whiting fishing season, which they assert
7  begins on April 1, 2012, but state that new regulations can be in place by the start of the 2013
8  fishing season on April 1, 2013.  Defendants further argue that this Court should not vacate
9  the existing regulations while the matter is under review.

**Time for Implementing New Regulations**

11      The start of the Pacific whiting fishing season is governed by regulation.  It begins on
12  May 15 of each year for the catcher/processor and mothership sectors, but as early as April 1
13  for the shorebased IFQ program, depending on geographical latitude.  50 C.F.R.
14  § 660.131(b)(2)(iii).  Thus, Defendants are correct that the fishing season begins as early as
15  April 1, and not on May 15, as Plaintiffs assert.
16      Defendants also presented evidence that it would be unworkable to change quota
17  share amounts once the fishing season has begun:

> Each owner of a whiting quota share permit receives two distributions of whiting quota pounds.  The first limited distribution of 2012 whiting quota pounds occurred on December 29, 2011, based on the lower range of potential whiting harvest amounts.  The final whiting harvest amount is known by March 25.  Once the final harvest amount is known, another distribution of whiting quota pounds occurs so that the total quota pounds issued for that year is equal to the permit owner's whiting quota share multiplied by that year's whiting shorebased trawl allocation. . . .  Once the quota pounds are distributed to quota share accounts, the quota pounds can be sold, transferred, or leased to other participants in the shorebased IFQ fishery.  Any change in initial quota share amounts that occurs during 2012 after the primary shorebased whiting fishery begins could be virtually impossible to implement.  For example, if a permit owner's whiting quota share were reduced mid-season, the permit owner's corresponding whiting quota pounds would need to be reduced.  However, if the quota share permit owner has already transferred quota pounds based on private business agreements, NMFS [the National Marine Fisheries Service] lacks

2

> the ability to determine who currently owns the quota pounds attributable to different quota share accounts, and also lacks the ability to determine if quota pounds already fished are attributable to a specific quota share account. Simply put, once quota pounds are issued and quota pound trading or fishing occurs, taking back quota pounds to adjust for changes in quota share amounts is impracticable mid-season.

Lockhart Decl. ¶ 12. The Court finds this evidence persuasive, especially in the absence of any contrary evidence or argument by Plaintiffs that changing quotas mid-season is feasible. The question for the Court is therefore whether it should order implementation of new regulations prior to April 1, 2012, or April 1, 2013.

Plaintiffs have presented no authority for ordering the implementation of revised regulations in less than two months, or even in three months if Plaintiffs' asserted start date were assumed to be true, and the Court finds such a timetable to be unreasonable. Indeed, Plaintiffs' initial supplemental brief appears to recognize that it may not be feasible to implement regulations by May 15, 2012, since it requested vacatur of existing regulations only if revised regulations were not in place by December 1, 2012. In addition, the primary case relied on by Plaintiffs in their supplemental reply brief ordered a one-year deadline on remand – far longer than the three months Plaintiffs request here. *See Natural Res. Def. Council v. Locke*, Case No. C01-0421 JL (N.D. Cal.), Apr. 29, 2010 Order on Remedy (Ex. 3 to Pls.' Suppl. Reply Br.).

Plaintiffs appear to assume that Defendants need only perform simple mathematical calculations using existing historical catch data before they can implement new regulations. While that is one option open to Defendants, it is not the only one. For example, Defendants might also want to consider whether it is "appropriate to increase the number of worst years that any individual may drop (from two in the current formula to some higher number); earlier years in the allocation period might be removed to maintain a consistent length for the allocation period; or a different method for weighting the years might be appropriate." Second Lockhart Decl. ¶ 13. Put simply, Plaintiffs are not entitled to have Defendants adopt their requested methodology, nor is it the Court's role to dictate to Defendants how the regulations should be revised. As the Supreme Court has explained:

3

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Midwater Trawlers Coop. v. Dep't of Commerce*, 282 F.3d 710, 721 (9th Cir. 2002) (remanding to NMFS "to either promulgate a new allocation consistent with the law and based on the best available science, or to provide further justification for the current allocation that conforms to the requirements of the Magnuson-Stevens Act and the Treaty of Neah Bay," rather than remanding with specific instructions on how to determine a new allocation). Plaintiffs have not persuaded the Court that this case presents "rare circumstances" in which a specific remand order would be appropriate, and Plaintiffs themselves appear to recognize the impropriety of a specific remand order, noting that an order on timing "is all that plaintiffs seek here." Pls.' Suppl. Reply at 7 n.5.

In light of all of the above, the Court finds it appropriate to remand the affected regulations for reconsideration in light of the Court's summary judgment ruling, with revised regulations to be implemented no later than April 1, 2013. Plaintiffs argue that Defendants may adopt emergency regulations by statute, 16 U.S.C. § 1855(c), but the Court agrees with Defendants that it would be improper to order Defendants to exercise their discretionary power to adopt emergency regulations – although, on remand, Defendants should consider whether use of this mechanism is appropriate.

### **Whether Existing Regulations Should Be Vacated Pending Remand**

When determining whether to vacate regulations pending remand, courts consider several factors, including "the seriousness of the [regulations'] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed," *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks and citation

omitted), as well as "the purposes of the substantive statute under which the agency was acting" and "potential prejudice to those who will be affected by maintaining the status quo," *Natural Res. Def. Council v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1144 (C.D. Cal. 2002).

Plaintiffs initially agreed that vacatur need not be ordered as long as new regulations were implemented by December 1, 2012. *See, e.g.,* Pls.' Suppl. Br. at 5 ("[E]quity supports a finding that the existing IFQ Regulations should be preserved pending remand."). As discussed above, the Court finds it would be unworkable to change allocations in the middle of a season. Thus, based on Plaintiffs' initial agreement that the regulations need not be vacated before December 1, 2012, it would be appropriate to leave the existing regulations in place through the start of the 2013 fishing season on April 1, 2013.

Plaintiffs changed their position in their supplemental reply brief and now argue that vacatur is necessary pending remand unless Defendants implement new regulations prior to May 15, 2012. However, they have presented no evidence of changed circumstances that would warrant a change in position from their opening supplemental brief, filed just two weeks earlier.

Moreover, the Court finds the balance of factors in this case to weigh against vacatur. Plaintiffs argue that they will be harmed economically if the existing regulations are left in place, but their assertions of harm are exaggerated, as well as imprecise as to the amount of their projected harm. Plaintiffs begin with the incorrect premise that the existing regulations will remain in place for an additional two years when, in fact, the Court has ordered the regulations to be revised by the start of the 2013 fishing season, leaving the regulations in place for only one additional year. In addition, while Plaintiffs might well gain quota share after Defendants have revised the regulations, this outcome is not guaranteed. Plaintiffs have also failed to present evidence that they would benefit economically from a fishing season in which overall harvest was limited but no individual quotas existed, which would be the effect of vacatur. It could be, for example, that other participants would increase their catch beyond their existing individual quotas and do so more quickly than Plaintiffs, thereby

1 diminishing the amount of catch available to Plaintiffs before the overall harvest limit were
2 reached.

3 　　　As Plaintiffs acknowledge, leaving existing regulations in place will benefit some
4 fishery participants while harming others. Marchand Decl. ¶ 5. However, the magnitude of
5 such benefits and harms remains unknown because it is uncertain how Defendants will revise
6 the regulations on remand. Additionally, Plaintiffs have offered no evidence to rebut
7 Defendants' evidence that vacatur would lead to significant disruptions in the fishery. For
8 example:

> No shorebased processors would receive individual whiting quota, which would result in lost revenue and less flexibility to adapt to the changes in the groundfish fishery expected under the trawl rationalization program. Whiting processors may also have [to] revisit any contracts that they have entered into with fishers, while vessels involved with the coop may have to revisit decisions on whether to remain in Alaska to fish Pollock or come down to fish Pacific whiting. In addition, fishing strategies, business plans, capital investments, and other aspects of the whiting fishery that are currently being implemented based on the expectation that whiting will be managed with IFQs and coop programs, would all be affected if the existing regulations were vacated.

16 Lockhart Decl. ¶ 14. Vacatur would also cause disruption in the management of the fishery
17 by NMFS and, due to the "highly variable behavior" that would result if no individual quotas
18 were in place, could result either in "closing the fishery too early, resulting in millions of
19 dollars of lost revenue to struggling coastal communities, or too late, with potential
20 conservation costs to the affected stocks." *Id.* ¶ 15. After balancing relevant factors, the
21 Court therefore finds it appropriate to leave the existing regulations in place pending remand.
22 If Defendants fail to adopt revised regulations prior to the start of the 2013 fishing season,
23 the Court may re-visit this determination.

## CONCLUSION

26 　　　For the reasons set forth above, the Court now remands the regulations affected by its
27 December 22, 2011 summary judgment ruling for further consideration consistent with that
28 ruling, the Magnuson-Stevens Fishery Conservation and Management Act, and all other

6

1  governing law.  Defendants shall implement revised regulations before the 2013 Pacific
2  whiting fishing season begins on April 1, 2013.  In the interim, the existing regulations shall
3  remain in effect.  The Court shall retain jurisdiction over Defendants' actions on remand.
4        The Clerk shall enter judgment and close the file administratively.  However, until the
5  revised regulations have been implemented, Defendants shall file status reports with this
6  Court every three months, beginning on April 1, 2012.  The Court may schedule a hearing to
7  consider whether interim remedies are appropriate if it becomes apparent that Defendants are
8  not acting as expeditiously as possible and do not appear to be on track to meet the April 1,
9  2013 deadline ordered by this Court.

**IT IS SO ORDERED.**

Dated: 02/21/12

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT